United States District Court
Southern District of Texas
FILED

JUL 2 9 2010

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### Houston Division

)
UNITED STATES OF AMERICA ex *rel.*  )
KATHLEEN A BRYANT,  )
  )
    *Plaintiffs,*  )
  )
    *v.*  )
  )
COMMUNITY HEALTH SYSTEMS, INC. and )
HERITAGE MEDICAL CENTER,  )
  )
    *Defendants.*  )
  )

Civil Action No.

# 10-2695

JURY TRIAL DEMANDED

**FILED UNDER SEAL**

## COMPLAINT

On behalf of the United States of America, plaintiff and relator Kathleen A. Bryant files this *qui tam* complaint against defendants Community Health Systems, Inc. and Heritage Medical Center to recover damages resulting from defendants' knowing efforts to defraud government-funded health insurance programs by improperly upcoding hospital claims.

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent claims submitted and statements made or caused to be made by defendants to the United States in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"). The false or fraudulent claims, statements and records at issue involve payments made by government-funded health insurance programs, such as Medicare, for services provided by defendants.

2.    Ms. Bryant alleges that defendants knowingly defraud government-funded health insurance programs by submitting false claims for payment and using false

statements and records material to those claims.  Defendants routinely admit patients inappropriately and alter physician diagnoses to increase falsely the severity of the patient's condition.  The result is that Defendants bill for services that should have been performed on an outpatient or observation basis as if they were more expensive inpatient services and inflate the severity of inpatient services to generate illicit reimbursements.  Defendants primarily did this in two ways.

3.      Defendants designed an internal case management structure that systematically overrides physicians' diagnoses, resulting in upcoding and inaccurate assignment of the Diagnostic Related Group (DRG) applicable to a patient's treatment in order to increase fraudulently the amounts paid by government-funded health insurance programs.  Case managers are paid bonuses based on their success in increasing the hospital's "case mix index" by changing the patient's diagnosis, resulting in upcoding and inaccurate assignment of the DRG.

4.      Defendants also billed short-term, outpatient hospital visits — those that should last less than 24 hours and should be coded as "patient observation" — as if they required an overnight stay, fraudulently qualifying the service for reimbursement as a much more expensive inpatient service.

5.      Defendants' corporate and local management implemented, encouraged and facilitated these fraudulent billing practices.

## PARTIES

6.      Kathleen A. Bryant is a compliance professional with extensive experience working with hospitals.  In January 2009, Ms. Bryant joined defendant Heritage Medical Center as Director of Health Information Management with primary responsibility for

— 2 —

ensuring the accuracy, integrity, completeness and timeliness of medical record documentation.  Ms. Bryant resigned her position in December 2009 after hospital officials repeatedly refused to follow her advice, preferring to continue defrauding government-funded health insurance programs.  Ms. Bryant brings this action for violations of the FCA on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

7.     Defendant Community Health Systems, Inc. (CHS) is a Delaware corporation and the largest publicly-traded operator of hospitals in the United States by number of facilities and net operating revenue.  As of December 31, 2009, CHS owned or leased 122 hospitals in 29 states, including numerous facilities in the Southern District of Texas. During 2009, the company generated over $12 billion in net operating revenue providing a broad range of general and specialized hospital healthcare services to patients, including general acute care services, emergency room services, general and specialty surgery, critical care, internal medicine, obstetrics and diagnostic services. CHS also owns physician practices, imaging centers and ambulatory surgery centers.

8.     Defendant Heritage Medical Center ("Heritage"), located in Shelbyville, Tennessee, is a 60-bed acute care hospital.  It is owned and operated by Defendant CHS.

9.     CHS maintains a centralized corporate compliance function.  None of the hospitals owned by CHS has its own compliance department.  Compliance professionals at each hospital report to and rely on CHS's corporate offices for direction and guidance.

10.     Ms. Bryant had extensive conversations with senior managers at CHS about the issues which form the foundation of this action.  Because CHS was involved in discussions concerning the wrongdoing and failed to correct it, and because Ms. Bryant has evidence that the FCA violations she observed at Heritage Medical Center resulted from

corporate directives, Ms. Bryant alleges that all CHS hospitals are engaging in similar fraudulent conduct.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.     The Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

13.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendants can be found, reside or have transacted business in the Southern District of Texas.

14.     Substantially the same allegations or transactions as alleged in this action or claim have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media.

15.     To the extent that, unknown to the relator, there has been a public disclosure of substantially the same allegations or transactions as alleged in this action or claim, the relator is an original source under 31 U.S.C. § 3730(e)(4).  Relator has either voluntarily disclosed to the Government the information on which her allegations or transactions are based, or has knowledge that is independent of and materially adds to the publicly

disclosed allegations or transactions and has voluntarily provided the information to the Government before filing an action under this section.  *See* 31 U.S.C. § 3730(e)(4)(B).

**BACKGROUND ALLEGATIONS**

16.     Defendants' wrongdoing was committed against government-funded health insurance programs, primarily Medicare.

17.     Medicare is a federally-funded health insurance program primarily benefiting the elderly.  It was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare is administered by and through Centers for Medicare & Medicaid Services ("CMS").

**Inpatient and Outpatient Status Defined**

18.     Medicare defines an inpatient as a "person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." *Medicare Benefit Policy Manual,* Ch.1, § 10 (Pub. 100-02).  The patient's physician is "responsible for deciding whether the patient should be admitted as an inpatient." *Id.*  Physicians may order inpatient "admission for patients who are expected to need hospital care for 24 hours or more, and treat others on an outpatient basis." *Id.*

19.     Bridging the gap between inpatient and outpatient admission status is "outpatient observation" status. "Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." *Id.*

20.     Outpatient observation is a specific hospital admission status that may be appropriate under a variety of circumstances.  It is "commonly assigned to patients . . .

who require a significant period of treatment or monitoring before a decision is made concerning their admission or discharge." *Medicare Benefit Policy Manual*, Ch. 6, § 20.5.A. (Pub. 100-02); *see Medicare Claims Processing Manual*, Ch. 4, § 290.1 (Rev. 1, 10-03-03). Outpatient observation also is appropriate when the physician requires additional time to evaluate the patient before deciding whether the patient needs inpatient admission or the physician anticipates that the patient's condition can be evaluated or treated within 24 hours or rapid improvement in the patient's condition is anticipated within 24 hours. Observation status is commonly assigned to patients who present to the emergency department and require a period of treatment or monitoring before a decision is made concerning their admission or discharge. *Medicare Benefit Policy Manual,* Pub. 100-02, Ch. 6, Sec. 20.5.A  Observation status is also often appropriate for outpatient surgical patients whose condition requires extra recovery or follow up care. *Id.*

21.    CMS directs that services "provided for the convenience of the patient, the patient's family, or a physician" including — services "following an uncomplicated treatment or a procedure" — are not covered as outpatient observation services.  In addition, "[s]tanding orders for observation following outpatient surgery" are not covered. *Medicare Benefit Policy Manual* at § 20.5.D.

22.    Altering a patient's status from outpatient to observation to inpatient has cost ramifications for Medicare.  In general, Medicare pays significantly more to a hospital for a patient admitted under inpatient status than for a patient treated as an outpatient or under observation status.  As a result, by increasing the number of patients placed into inpatient status, a hospital can greatly increase the payments it receives from Medicare.

**Billing of Hospital Medicare Claims**

23.     Outpatient procedures are classified and reported using Medicare's HFCA Common Procedure Coding System ("HCPCS").   This system is intended to simplify reporting of services rendered and to identify the services or supplies provided.   The HCPCS Coding system consists of three coding levels.  Level I codes are found in Current Procedural Terminology ("CPT"), published by the American Medical Association.  The CPT uses five-digit codes with descriptive terms to identify services performed by health care providers and is the country's most widely-accepted coding reference.   Level II national codes (also referred to as "HCPCS") have been developed by HFCA to report medical services and supplies not found in the CPT.  Level III local codes are assigned and maintained by individual Medicare carriers to describe new procedures that are not yet included in Level I or Level II codes.   Documentation supporting the medical necessity for treatment, such as a diagnosis code, must be submitted with each claim for payment. Diagnoses are classified and reported using International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics.

24.     Inpatient procedures are billed using a different system.  Section 1886(d) (42 U.S.C. §1395ww(d)) of the Social Security Act mandates a system of payment for the operating costs of acute care hospital inpatient stays under Medicare Part A (Hospital Insurance) based on prospectively set rates.  The prospective payment was intended to be a single, all-encompassing payment covering all facility and ancillary charges, regardless of how long the patient is admitted or the number of services provided.

25.   This payment system is referred to as the inpatient prospective payment system (IPPS).  Under the IPPS, each case is categorized into a diagnosis-related group (DRG).  Over time, DRG payments have evolved so that they are now adjusted based on a variety of factors, including a wage index to account for regional salary variations, medical education costs, cost outliers for cases with extremely high overall costs, and disproportionate share payments to hospitals that treat a large percentage of low income patients.  DRG payments may also be increased to hospitals that qualify as a sole community hospital, a Medicare-dependent rural hospital or a regional referral hospital.

26.   In addition to these factors, each DRG is assigned a payment weight that reflects the average resources used to treat Medicare patients in that DRG.  The payment weight acts as a multiplier of the hospital's DRG payment, after it is augmented by the other factors described above.

27.   A DRG's payment weight is affected by the patient's diagnosis.  Diagnoses are divided by CMS into three different levels of severity.  The three levels are MCC (Major Complication/Comorbity), CC (Complication/Comorbity) and Non-CC (Non-Complication/ Comorbity).  MCCs reflect the highest level of severity while Non-CCs reflect the lowest.

28.   In general, the Non-CC diagnosis codes do not significantly affect severity of illness or resource use while a CC or MCC has an impact on severity of illness and hospital resource use, resulting in a higher payment weight and increase payment to the hospital. By altering a patient's diagnosis or DRG, a hospital can increase the case mix index (i.e., payment weight) and significantly increase the Medicare payment amount.  In this case, defendants schemed to improperly increase the case mix index applicable to their Medicare claims.

— 8 —

**Services Must be "Medically Necessary" and Fully Documented**

29.     Medicare requires, as a condition of coverage, that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A). Providers must provide economical medical services and, then, provide such services only where medically necessary. 42 U.S.C. § 1320c-(a)(1). Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6)&(8).

30.     Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320-a-7b(a)(1). Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to the Medicare to disclose those omissions or errors to the Government. See 42 U.S.C. § 1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See*, e.g., 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

**Defendants Worked to Improperly Increase
"Case Mix Index" and Increase ER Admissions**

31.     Immediately prior to Ms. Bryant's arrival at Heritage Medical Center, CHS instituted a new program designed to increase the Hospital's revenues by increasing its "case mix index" or CMI. The new program involved having Case Managers, rather than medical staff, dictate patient discharge summaries. The Case Managers received coding education that was designed to help them increase the CMI. They were taught how to use higher level DRG codes and certain diagnoses to justify increased patient severity and

higher reimbursements, often relying on "grouper" software, manufactured by 3M, to identify the higher-paying DRG codes and diagnoses.  At the same time, defendants made a concerted effort to admit more patients through the Emergency Room (ER), even those patients whose conditions did not warrant an inpatient stay.

32.     As part of the program, defendants also made bonus payments to the Case Managers as financial incentives for them to increase Medicare reimbursements.  Chief Executive Officer Dan Buckner accidentally mentioned these bonuses during a meeting that Business Office Director Sharon McCree and Ms. Bryant attended.  When he realized his slip, Buckner told McCree and Ms. Bryant that they, too, would receive bonuses.  Later, Inpatient Medical Coder Carol Haddon confirmed to Ms. Bryant that the Case Managers receive "hefty monthly bonuses" for increasing the hospital's revenues.

33.     Ms. Bryant was alarmed by this new program, which she felt was highly inappropriate and would result in fraudulent charges to Medicare.  She spoke to her immediate supervisor, Chief Financial Officer Alan Lovelace, and expressed her concerns. Lovelace agreed to look into the matter.

34.     Meanwhile, Ms. Bryant, CEO Buckner, CFO Lovelace, Compliance Officer Jeremy Gray, Inpatient Medical Coder Carol Haddon, Case Manager Director Leah Hedge and Case Managers Jenny Gilbert, Linda Griffin and Annie Kunkel met periodically to review the effect of the new discharge summary procedure on the CMI.

35.     During the first meeting that Ms. Bryant attended, CEO Buckner reminded the group that he had been promised that the hospital's CMI would rise to 1.80 once the Case Managers began dictating discharge summaries.  CMS uses a baseline CMI of 1.00, so a CMI of 1.80 would be 80% more severe than the standard case.  Upon hearing Buckner's

statement, Ms. Bryant noted that Heritage's current CMI was approximately 0.90 to 1.00 and that to achieve such a goal there would need to be a large change in the severity of illness in patients.  In response, Buckner reiterated that he was promised by the Case Managers that the CMI would increase to 1.80 if they dictated the discharge summaries.

36.     Ms. Bryant told the group that the CMI could not be significantly increased by having the Case Managers dictate discharge summaries because the summaries are dependent on the medical diagnoses documented by the physicians.  Buckner replied that if the discharge summary included a diagnosis not previously provided by the physician, the diagnosis could be coded, thereby increasing the CMI.  Ms. Bryant disagreed and produced coding guidance from the American Health Information Management Association to support her claims.  CEO Buckner was openly annoyed with Ms. Bryant's position and the meeting proceeded to continue discussing ways that CMI and Medicare reimbursements could be increased.

37.     During the weeks that followed, Ms. Bryant was told by CEO Buckner and CFO Lovelace that CHS has instructed Heritage and all other CHS facilities to increase the number of full hospital admissions through the ER.  Hospitals were instructed to place all patients entering the hospital in "full inpatient admit status."

38.     Medicare requires hospitals to perform a "utilization review" upon all inpatient admissions prior to the patient's discharge and submission of the claim to ensure that the inpatient admission meets appropriate criteria.  If the hospital determines that a patient initially treated as inpatient should be handled on an observation or outpatient basis, the claim is billed using "Code 44."  Medicare generally does not permit status changes to occur after the patient is discharged and the claim has been submitted.

39.     Despite these regulatory requirements, Defendants' Case Managers made frequent post-discharge "status changes" to move patients among different admission statuses.   They completely ignored Medicare billing requirements and continued to do whatever they saw fit to increase their CMI and reimbursement amounts.   If defendants' officials were unhappy with the CMI, Case Managers pulled Medicare patient charts for certain DRGs, re-reviewed them in an effort to increase the CMI and reimbursement value, and rebilled them at higher rates to the government-funded program.   Ms. Bryant even observed an inpatient admission downgraded to observation status because it was financially more lucrative for Heritage in that particular instance.   This type of behavior that attempts to undermine the integrity of the patient's medical record is precisely what Medicare prohibits.

40.     In approximately June 2009, Ms. Bryant forwarded to Compliance Officer Gray evidence received from a coder seeking to change diagnoses in order to increase the CMI, Gray told her to stop sending him that type of information because he "did not know who to trust," the information was "discoverable" and he did not want it on his computer. CFO Lovelace expressed similar sentiments.

41.     Business Office Director McCree was the one person who seemed to share Ms. Bryant's concerns.   McCree approached Ms. Bryant seeking her opinion on the Case Managers' practice of writing "clarification order" on the doctor's orders when changing the patient's status, after discharge, for reimbursement purposes.   Ms. Bryant agreed with McCree that the practice was improper and together they approached CFO Lovelace to discuss the issue.   Lovelace listened to their concerns, said that they should do what they felt was right, but took no further action.

— 12 —

42.     McCree raised these issues with her corporate director, a woman named "Tootsie," who in turn raised the question with Debbie Macaulay, Ms. Bryant's corporate director.  A series of conference calls took place between Ms. Bryant, McCree, Tootsie, and Macaulay, which resulted in Tootsie instructing McCree to send CFO Lovelace a notice of every Medicare re-bill to make sure he was aware of the fraudulent behavior.  Macaulay told Ms. Bryant that she intended to speak with CEO Buckner about the impropriety of making post-billing coding changes to Medicare claims and the practice of changing codes based on the discharge summary dictated by the Case Managers.

43.     As a result of these discussions, during September 2009, Ms. Bryant was admonished by CEO Buckner for going around him and sharing her concerns with the CHS corporate office.  He indicated that CHS was well-aware of the coding and billing practices, telling her that CHS was not afraid of CMS and that the company would fight CMS, if necessary.  Buckner ordered her to "stop using the F-word," noting that mentioning "fraud" was not helpful.  He suggested that Ms. Bryant be less aggressive in her efforts to raise these issues, but stressed his intentions to continue aggressive efforts to maximize Medicare payments.

44.     Ms Bryant received a telephone call from Macaulay the following morning, informing her that Buckner was acting on a Corporate directive to increase the number of admissions from the ER. CHS hospitals use an internal "Little Blue Book" to determine if a patient qualifies for admitted to the hospital.  The "Little Blue Book" is used instead of the nationally-recognized  InterQual or Millman criteria, the latter of which is sanctioned by CMS.  According the McCree, CHS's "Little Blue Book" uses very liberal and vague criteria to ensure a high volume of admissions.

45.     That same day, CFO Lovelace approached Ms. Bryant and reiterated that CEO Buckner is "only doing what he is told by Corporate."  He made clear that the billing process was not a "local" issue and that it was being done to increase corporate revenues. He said that during a recent conference call with the CHS Corporate Office, he and Buckner were questioned as to why Heritage was not admitting more Medicare patients through the ER.  Lovelace said he and Buckner were told that other CHS hospitals were admitting nearly 100% of the Medicare patients seen in their ERs and that Heritage was under orders to follow suit or face consequences.

46.     McCree reported to Ms. Bryant that CEO Buckner had stopped into a meeting that she was having with Hedge around this same time to inquire about the CMI for October 2009.  When Hedge told him that the CMI was lower than had been hoped, Buckner told her that the result was "not acceptable" and that "our survival depends" on increasing the CMI.

47.     During a meeting in November 2009, with Lovelace, Hedge, McCree, Dr. Lana Beavers, a new physician advisor for case management, and Ms. Bryant, Lovelace asked for the percentage of cases that were being inappropriately admitted through the ER. McCree, Beavers and Ms. Bryant agreed that approximately 50% of the admissions were inappropriate and should have been handled as observation or outpatient status, if at all. Lovelace was surprised but again noted that Heritage was bound by Corporate directive and could not alter the admissions policy.  A discussion regarding Hedge's practice of marking "clarification order" on physician orders ensued with Hedge's arguing that there was nothing wrong with doing so.  Lovelace finally told Hedge, "Look, it is a very, very bad

practice.  Don't do it any more."  Still, the practices continue and the fraudulent submission of false claims persists.

48.    During the period January through July 2009, Ms. Bryant became aware that a number of physicians were unhappy that the Case Managers were altering their orders and admissions.  Several physicians, including Drs. Clement Bernard, Navid Monajjem, Cristina Parawan and Alma Tamula, complained to Bryant that incorrect diagnoses were being added to discharge summaries and that patients who did not require hospitalization were being admitted as inpatients.  Ms. Bryant told the physicians to talk to CEO Buckner, but they indicated that such complaints had fallen on deaf ears, that the situation had been going on for a long time and complaints were made all the way up to corporate.  The ER physicians confirmed that had been instructed by Buckner to increase the number of admissions, especially for Medicare patients.   Bryant advised the physicians to read carefully all discharge summaries for accuracy before signing them.

49.    Dr. Clement Bernard, a cardiologist, told Ms. Bryant, during a training workshop in June 2009, that the key problem was the hospital admitting patients who were not sick.  He said that Defendants were committing fraud.  Drs. Alma Tamula, Cristina Parawan, and Navid Monajeem, as well as several others, ordered that the Case Managers no longer dictate their discharge summaries because they were tired of having diagnoses added "that do not exist."  Some physicians refused to sign the telephone orders ("TOs") that the Case Managers used to document changes in patient status because they said they never gave the order.

50.    During her time at Heritage, Ms. Bryant brought her concerns to the attention of CEO Buckner, CFO Lovelace, Compliance Officer Gray, Case Management Director

— 15 —

Hedge, Inpatient Coder Haddon, Director of the Business Office Sharon McCree and Regional Corporate Director of Health Information Management Debbie Macaulay. She presented documentation from CMS, OIG and coding organizations that supported her views. Her concerns were minimized, her role marginalized and the improper practices continued unabated. Her superiors began circumventing her authority and dealing directly with Ms. Bryant's subordinates. When Ms. Bryant asked CEO Buckner why he no longer sought her advice, he told her it was because "he does not like her answers."

51.     Because Ms. Bryant's allegations of wrongdoing and the specific practices of which she complained were well-known to senior Heritage executives and CHS senior management personnel and because such individuals facilitated and encouraged the fraudulent billing, Ms. Bryant alleges upon information and belief that the billing fraud was being committed at all hospitals owned by Defendant CHS.

52.     Defendants' actions resulted in the knowing submission of false claims to government-funded health insurance programs, particularly Medicare, because the claims falsely identified the patient's treatment as meeting applicable standards for inpatient status when treatment should have been provided and billed on an outpatient observation or outpatient basis.

53.     Ms. Bryant alleges that thousands of medical treatments were routinely and fraudulently billed by Defendants as inpatient claims when such status was neither medically necessary nor justified by regulatory standards.

54.     By way of example, Patient No. 5179333 was admitted to Heritage on March 9, 2009 and discharged on March 13, 2009. Carol Haddon, from Ms. Bryant's staff, contacted Dr. Bernard, the treating physician, to ask whether the patient was properly

assigned to inpatient or observation status. Dr. Bernard responded, in writing, by confirming observation as the appropriate status. Five weeks later on April 15, 2009, Case Manager Hedge added a "late entry" to the patient's Physician Progress Notes that read: "Personally spoke c̄ [with] Dr. Bernard who clearly remembered this case. I asked what was the admit status intended to be [and] he stated "inpatient." Order clarification, this status is inpatient." The falsification of the patient's medical record over a month after the patient was discharged clearly resulted in a false claim being submitted.

55.     Ms. Bryant also alleges that thousands of inpatient claims were fraudulently billed by Defendants using inappropriate diagnosis codes (e.g., codes that corresponded with a Major Complication/Comorbity or Complication/Comorbity) to increase the payment weight and, therefore, the reimbursement paid for the claim.

56.     Although Ms. Bryant cannot identify every false claim that Defendants submitted to government-funded health insurance programs, such information being in the possession of the Defendants, she alleges that the procedures performed or treatment provided to the following patients were improperly billed, resulting in false claims being submitted to the United States:

| Date of Admission | Patient Identifier | Physician |
|---|---|---|
| 02/22/09 | 5177160 | Adams |
| 02/24/09 | 5177487 | Tamula |
| 03/09/09 | 5179333 | Bernard |
| 05/14/09 | 5189093 | Bernard |
| 05/13/09 | 2003775 | Loleh |
| 03/09/09 | 5179333 | Bernard |

## COUNT ONE
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)

57.     Relator re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 of this complaint.

58.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

59.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States Government false or fraudulent claims for payment.

60.     By virtue of the acts described above, Defendants knowingly concealed the existence of their improper conduct from the United State Government in order to induce payment of false or fraudulent claims.

61.     The United States, unaware of the Defendants' wrongdoing or the falsity of the records, statements or claims made by the Defendants or the Defendants' wrongdoing, paid claims that would not otherwise have been allowed.

62.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

63.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 56 of this complaint.

64.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

65.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records or statements material to a false or fraudulent claim.

66.     By virtue of the acts described above, Defendants knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of their false or fraudulent claims.

67.     The United States, unaware of the Defendants' wrongdoing or the falsity of the records, statements, or claims made by the Defendants or Defendants' wrongdoing, paid claims that would not otherwise have been allowed.

68.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, relator requests that judgment be entered in favor of the United States, State of Texas and Relator against Defendants, ordering that:

a.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.;

b.     Defendants pay an amount equal to three times the amount of damages that the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

      d.     Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d); and

      f.     the United States and Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator hereby demands a trial by jury.

Respectfully submitted,

Mitchell R. Kreindler
Texas Bar No. 24033518
S.D. Tex. Bar No. 32980
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, Texas 77024-1415
T 713.647.8888
F 713.647.8889
mkreindler@blowthewhistle.com

ATTORNEY IN CHARGE FOR
*QUI TAM* RELATOR KATHLEEN A. BRYANT